UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**Cory R. Fountain,**

**Plaintiff,**

**-v-**                                                              **8:13-CV-255 (NAM/RFT)**
                                                                      **Lead Case**

**United States of America, United States Department
of Agriculture, and Anwar M. Karim**

**Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**Anwar M. Karim,**

**Plaintiff,**

**-v-**                                                              **3:14-CV-964 (NAM/CFH)**
                                                                      **Member Case**

**United States of America and Thomas Vilsack as
Secretary of the United States Department of
Agriculture,**

**Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:

Martin Harding Mazzotti LLP
Robert S. Bruschini, Esq., of counsel
1222 Troy-Schenectady Road
P.O. Box 15141
Albany New York 12212
Attorneys for Corey R. Fountain

Towne, Ryan & Partners, P.C.
James T. Towne, Jr., Esq., of counsel
Susan F. Bartkowski, Esq., of counsel
450 New Karner Road
P.O. Box 15072
Albany, New York 12212
Attorneys for Anwar M. Karim

Office of the United States Attorney

Charles E. Roberts, Esq., Assistant United States Attorney
100 South Clinton Street
Syracuse, New York 13261
Attorney for United States of America and Thomas Vilsack

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

At 6:00 p.m. on August 31, 2010, Anwar M. Karim, then a conservationist employed by the United States Department of Agriculture ("USDA"), drove a Government vehicle from his temporary duty station to the hotel in which he was temporarily housed. At 6:30 p.m., as he was entering the hotel parking lot, Karim's vehicle struck a vehicle operated by Cory R. Fountain, allegedly causing injuries. It is undisputed that Karim's negligence caused the accident.

Fountain sued Karim, the United States, and the United States Secretary of Agriculture, asserting claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80; New York Vehicle and Traffic Law ("V&T Law") § 388; and New York's common law. *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255. Karim cross-claimed against defendants in Fountain's case and filed a separate declaratory judgment action seeking defense and indemnification against the Government and Thomas Vilsack as Secretary of the USDA. *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture*, 3:14-CV-964. After completion of discovery, the Government moved for summary judgment dismissing Karim's indemnification action on the ground that Karim was acting outside the scope of his employment at the time of the accident. Karim moved for a declaratory judgment and certification ordering the United States to defend and indemnify him, and Fountain cross-moved for partial summary

judgment on liability in both actions.

This Court found that Karim was not acting within the scope of his employment at the time of the accident and dismissed the actions for lack of subject-matter jurisdiction under the FTCA. *Fountain v. United States*, 2015 WL 5602934 (N.D.N.Y. Sept. 23, 2016). On appeal, the Second Circuit vacated the dismissal, reinstated all claims, and remanded for an evidentiary hearing and further proceedings, primarily on the ground that "dismissal in this case was premature in light of an unresolved factual dispute over whether Karim used the vehicle with his employer's implied permission." *Fountain v. Karim*, 838 F.3d 129, 131 (2d Cir. 2016).

Upon remand, this Court held an evidentiary hearing. The Court now finds that Karim did not have implied permission to take the GOV for home-to-work travel on August 31, 2010 and was not acting within the scope of his employment at the time of the accident. Accordingly, the Court denies Karim's motion for a declaratory judgment/certification in both actions; denies without prejudice Fountain's motion for partial summary judgment in both actions; grants the Government's motion for summary judgment on the ground of lack of subject-matter jurisdiction; declines to exercise supplemental jurisdiction over Fountain's state-law claims against Karim and dismisses them without prejudice; dismisses Fountain's tort action for lack of subject-matter jurisdiction; and dismisses Karim's indemnification action for lack of subject-matter jurisdiction. Both actions are dismissed in their entirety without prejudice.

## BACKGROUND

The following background facts are undisputed unless otherwise noted. On the date of the accident, Karim was employed by the Natural Resources Conservation Service ("NRCS") of the USDA, as he had been for 27 years. His permanent work location was the USDA's Rochester

Field Office, where he was the sole NRCS employee. The Rochester field office was then part of the Finger Lakes Watershed area, also referred to as the Marcy area. Karim resided with his family in Rochester, New York.

Karim applied for and was awarded a 120-day temporary duty detail ("TDY") as Acting Assistant State Conservationist (Field Operations) in Walton, New York, from August 1 to November 20, 2010. He had previously worked on other temporary duty assignments. The Walton TDY was a temporary promotion with a higher salary. The "Official TDY Traveler Authorization" ("Traveler Authorization") for the assignment authorized reimbursement for his use of his personally owned vehicle ("POV") to travel from Rochester to Walton on August 1, 2010 and from Walton to Rochester on November 20, 2010. It also authorized a reimbursement rate for lodging, meals, and incidental expenses during the TDY.

Throughout the TDY, Karim resided at a Holiday Inn in Oneonta, New York, about 27 miles from the Walton office. Although there were accommodations available in Walton, he chose to stay in Oneonta. He used his POV for the daily commute between Oneonta and Walton. The Traveler Authorization did not authorize reimbursement for that daily commute, nor did it authorize the use of a Government owned vehicle ("GOV") for the commute. Karim also used his POV, without reimbursement, for his frequent weekend trips to Rochester to see his family.

Karim's Walton TDY required occasional travel to several field offices in New York State's Southern Tier covering a large geographical area, including Highland Falls and Bath. He was expected to complete a round trip to a field office in a single day. For such field work, Karim had daily use of a GOV, a 2009 Ford Explorer located in Walton, for which the Government reimbursed his gasoline expenses. Karim testified that when he arrived at the Walton office at the

-4-

beginning of his TDY on August 1, 2010, the keys to the GOV were in his desk. Similarly, at his permanent location in Rochester, Karim had been given the daily use of a GOV for field work. At both locations he customarily drove his POV to work in the morning, used the GOV if needed for official business during the work day, and then drove his POV back home or, when on TDY, to the hotel. At both locations, employees did not need to obtain permission to use a GOV for a work-related day trip. The Government imposed restrictions on employees' use of GOVs, such as keeping them locked when parked and not using them for personal convenience.

If an employee in Karim's status wished to take a GOV for home-to-work transportation (sometimes referred to by witnesses as "overnight storage"), the law and regulations required him to obtain a supervisor's permission by completing, signing, and submitting a Form AD-728, "Request and Authorization For Home to Work Transportation." As explained by Theresa Odekirk, a USDA Human Resources Specialist:

> [A Form AD-728 is] very significant because it documents the fact that an employee is taking a Government vehicle to their residence or to a Government facility that's near their residence. It documents the reason and the authorization period and, finally, the approval process. And at the very bottom of the form is where ... the appropriate management official is supposed to approve or disapprove.

At his permanent duty station in Rochester, prior to his TDY in Walton, Karim had occasionally sought and obtained approval to take a GOV from his duty station to his home at the end of the workday before traveling from home to a work-related destination the following day. To obtain such permission while working at the Rochester office, Karim submitted a Form AD-728 to his immediate supervisor, Bruce Hopkins, who was based in Marcy, New York. According to Karim, prior to August 31, 2010, his requests to use a GOV had never been denied. Aspects of the procedure whereby Karim obtained permission from Hopkins are in dispute, as are

-5-

the requirements applicable to Karim while on TDY in Walton.

On the date of the accident, August 31, 2010, Karim drove his POV from his temporary residence at the Oneonta Holiday Inn to the Walton office, arriving between 8:00 and 9:00 a.m. On the same day, at 5:57 p.m., three minutes before leaving his office with the GOV, Karim sent an email to his supervisor at the Walton office, Astor Boozer, a New York State Conservationist, stating: "Request to use Govt vehicle attached." Attached was an AD-728 form completed and signed by Karim, with checkmarks in the boxes indicating the following as reasons for using the GOV for home to work transportation: "Compelling operational considerations make the provision of home-to-work transportation essential to the conduct of official business or would substantially increase the agency's efficiency or economy. ... Storage of vehicle at residence due to economical or security reasons ... Field Work." On the AD-728 form, Karim added: "Description: On 8/31 Walton, NY to Oneonta, NY; on 9/1 Oneonta, NY to Highland Falls AO to Oneonta, NY & on 9/2 Oneonta NY to Walton, NY." In other words, Karim wanted to take the GOV from the Walton office to his hotel in Oneonta after work on August 31; store the GOV at the Oneonta hotel overnight; drive from Oneonta to the Highland Falls field office to perform official business and back to Oneonta on September 1; store the GOV at the Oneonta hotel overnight; and then drive the GOV to work at the Walton office the following morning, September 2. It is undisputed that this route added 97.2 miles to his round trip to Highland Falls. Karim did not receive a response to his email before leaving with the GOV at 6:00 p.m., nor did he telephone or otherwise attempt to communicate with Boozer, who was based in Syracuse and

who was likely not in the office at the time.[1]

At 6:30 p.m., as Karim entered the parking lot of the Oneonta hotel, he collided with Fountain's vehicle. A New York State Police officer issued Karim a ticket for "fail[ing] to give one half of roadway." Karim testified he reached Boozer by telephone on August 31, 2010 shortly after the accident to obtain insurance information and inform Boozer of the incident. Boozer testified he received no call from Karim on August 31 and first learned of the accident from his administrative assistant upon his arrival at the office the next morning, September 1, 2010.

By letter dated September 7, 2010, Michele DeMaio Grace, a USDA State Administrative Officer, appointed Odekirk to conduct an informal Fact Finding Investigation of possible misconduct by Karim, specifically whether he misused the GOV on August 31, 2010, by taking it from Walton to Oneonta without written authorization from his supervisor. Odekirk's Fact Finding Report, dated September 30, 2010, states that Odekirk interviewed Karim, Hopkins, and three employees to ascertain the policy and practices in the Marcy Area, which was under Hopkins' supervision and which included Karim's Rochester permanent duty station. Odekirk's report includes the following findings:

> (a.) That NRCS employee, Anwar M. Karim, did misuse Government property, specifically the Government Vehicle 2009 Ford Explorer A345273, in that he took the GOV without authorization to his residence 8/31/10. The AD-728 he submitted for approval on 8/31/10 was submitted at 5:57 PM, and he took the GOV without approval from his supervisor, Astor F. Boozer. Additionally, in the course of the investigation I found that Anwar Karim previously took the GOV without authorization during the period 8/24/10-8/27/10 in that he submitted an AD Form 728 on 8/24/10 and took the GOV without authorization, in that the AD Form 728 was not signed and his

---

[1] In his deposition, Boozer stated the "standard time frame" at Walton was 8:00 a.m. to 4:30 p.m.

supervisor, Astor F. Boozer, specifically stated he did not give Anwar Karim verbal or any written form of approval.

(b.)    That NRCS employee Anwar M. Karim did not have sufficient justification to submit an AD Form 728 Requesting Authorization for Home to Work Transportation of the GOV on 8/31/10 in that there was no justifiable reason for him to take the GOV to his residence in Oneonta. In fact taking the GOV from Walton to Oneonta, then from Oneonta to Highland, then from Highland to Oneonta, and then from Oneonta to Walton was in fact not advantageous to the Government and/or the efficiency of the service in that trip would be 269.46 miles whereas the trip from the duty location, Walton, to Highland, and return to Walton would be 172.26 miles. Taking the GOV to Oneonta resulted in an excess of 97.2 additional miles on the GOV. Considering the cost of gasoline that would be a significant additionally unwarranted expense just for the convenience of the employee. Additionally there is was no time savings in that if the employee traveled from his duty station of Walton, NY to Highland, NY that would be 1 hour and 56 minutes, whereas traveling from Oneonta to Highland would be 2 hours and 15 minutes, which is longer and therefore no advantage to the Government. Finally, there is no evidence of a safety issue concerning the drive from Walton, NY to Highland, NY. On August 31, 2010 the temperatures in New York were at record highs in the 90s, no evidence of heavy rain, sleet, hail or snow fall. Although some areas of the roads traveled between Walton and Highland may be winding roads, they are safe and sufficient if traveled at a safe speed, not exceeding the speed limit (which is a requirement while operating a Government vehicle. I personally have traveled that route 3-4 times a year over the last eight years and it is safe to travel even in difficult weather conditions.

(c.)  That the NRCS employees in the Marcy Area fully understand the policy and procedures for Requesting Authorization for Home to Work Transportation, i.e. taking a Government vehicle home for overnight storage. Interviews with 3 different types of employees in the Marcy Area (a District Conservationist, an Engineer, and a Biologist) in both supervisory and nonsupervisory positions, showed that the employees are aware of the policy and proper procedures for Requesting Authorization for Home to Work Transportation, i.e. taking a Government vehicle home for overnight storage. The employees have been trained and understood the work rules concerning the use of Government vehicles and in particular taking the Government vehicles home. There is no evidence that there has been a past practice in the Marcy Area of allowing employees to just submit the paperwork (the AD Form 728 request) to the Area office before taking the GOV, as asserted by Anwar Karim.

(d.)    That NRCS employee Anwar Karim was provided adequate and complete training on the Use of Government Resources, to include the Government Vehicle, and the requirements for Requesting Authorization for

-8-

Home to Work Transportation, i.e. taking a Government vehicle home for overnight storage, as noted in the training slides on the Use of Government Resources. Additionally, he was provided written guidance from Human Resources and the Financial Management Section on the use of the GOV while on Detail at the Walton Field Office as ASTC (FO).

Therefore I conclude that the employee, Anwar M. Karim, Acting Assistant State Conservationist (Field Operations), Walton, NY, did commit Misconduct through his unauthorized use of Government Property, specifically the Government Vehicle, 2009 Ford Explorer A345273, in that he failed to obtain proper authorization/approval as required in USDA Regulation 5400-5, Use of Government Vehicle for Home to Work, (Exhibit 15), dated January 22, 1996. The employee, Anwar Karim, knew that there was a rule-specifically the policy for Requesting Authorization for Home to Work Transportation, i.e. taking a Government vehicle home for overnight storage; the employee, knew or should have known, the rule, as he was provided training on the use of Government vehicles; the employee was aware of the work rules/policy, as he admitted when interviewed; and he violated the agency policy when he took the Government vehicle without proper authorization.

(Citations to exhibits omitted.) The training slides referred to in paragraph (d.) include a bulleted point stating that "Storing a Government Vehicle at or near an employee's residence [is prohibited] unless specifically authorized in writing." The training slides cite to 31 U.S.C. § 1344 and Form AD-728 as references.

Regarding the August 24, 2010 incident, the record establishes that at 4:21 p.m. on that date, a week before the accident, Karim had sent an email to Boozer with a Form AD-728 attached requesting the use of the GOV to travel from Walton to his hotel in Oneonta at the end of the workday on August 24, from Oneonta to the field office in Bath, New York, and back to Oneonta on August 25, and from Oneonta to Walton on August 26, 2010. At no time did Boozer respond to this email and attachment. At 6:00 p.m. on August 24, 2010, Karim drove the GOV to his Oneonta hotel. He drove the GOV to Bath and back to Oneonta on the following day, and returned the GOV to the Walton field office the next morning, August 26, 2010.

On January 14, 2011, at a meeting attended by Boozer, DeMaio Grace, and Karim, Boozer gave Karim a letter reprimanding him for his "Misuse of Government Resources," specifically the GOV, on August 31, 2010, when he took it from his duty location in Walton to his residence in Oneonta without authorization. The letter stated:

> When questioned during the Fact Finding Investigation, you indicated that you did take the Government Vehicle without written authorization. The findings of the investigation showed that you did in fact use GOV owned property ... without authorization in that the AD Form 728 was not approved by me, your supervisor, as I did not give you any form of verbal or written approval.

The letter continued:

> The investigation clearly found that you knew that there was a rule – specifically the policy for Requesting Authorization for Home to Work Transportation, i.e. taking a Government vehicle home for overnight storage; that you knew or should have known, the rule, as you were provided training on the use of Government vehicles; that you were aware of the work rules/policy, as you admitted when interviewed; and that you violated the agency policy when you took the Government vehicle without proper authorization.

The letter stated that Karim's actions were "unacceptable"; that Boozer was "limiting disciplinary action in this instance to a letter of reprimand"; and that "any future action of the nature reported above may lead to more severe disciplinary action." Karim signed the letter as "Received." He did not dispute the contents of the letter during the meeting and did not pursue the grievance procedure outlined in the letter. At the meeting, DeMaio Grace told Karim that the USDA Office of General Counsel had advised her that the Government would not defend or indemnify him if Fountain filed a tort claim as a result of the motor vehicle accident.

At some point, Boozer completed Standard Form 91, "Motor Vehicle Accident Report"; his signature is undated. He handwrote that the purpose of Karim's trip was "overnight storage of

GOV for business trip in morning (9/1)." In the space headed "Authority for the Trip was Given to the Operator," Boozer wrote: "No Authorization." To the question "Did this accident occur within the employee's scope of duty," Boozer checked the box for "No" and wrote: "Employee took GOV without signed authorization. Request would have been denied as not advantageous to govt. Employee not performing within the scope of his official duties."

Attached to the Standard Form 91 was Optional Form 26, titled "Data Bearing Upon Scope of Employment of Motor Vehicle Operator." Karim prepared and signed the form on August 31, 2010, apparently at the accident scene. Boozer signed it on October 9, 2010, verifying that "[t]he information contained herein is true and correct to the best of my knowledge and belief." The form states that it is "to be completed by the operator at the time and at the scene of the accident insofar as possible, and attached to the completed Standard Form 91, Operator's Report of Motor Vehicle Accident." In Box 10, "Authority for Operator's Use of Vehicle Was Given," Karim checked the box "In Writing" and handwrote the following: "Submitted request AD-728 prior to leaving office via email." In Box 13, "Exact Purpose of Trip," he wrote: "Travel to Highland Falls, N.Y. to the Service Center. Planned schedule depart Walton on 8/31 to Oneonta then on 9/1 depart to Highland Falls & return same day to Oneonta. On 9/2 depart to Walton – end of trip." In Box 16, "Authority for the Trip Was Given to the Operator," he again checked the box for "In Writing" and wrote "Submitted request to Supervisor prior to leaving." And in Box 18, "Was the Trip Made Within Established Working Hours," Karim checked the box "No" and wrote: "left after work – 6 p.m." At his deposition Boozer testified that he erred in signing the form, and at the hearing he testified that "parts of it are in error."

After the completion of discovery, the Government moved for summary judgment or

dismissal of Fountain's complaint for lack of subject-matter jurisdiction. Karim moved for a declaratory judgment ordering the United States to defend and indemnify him, and Fountain cross-moved for summary judgment in both actions. This Court dismissed all claims against the Government and USDA for lack of subject matter jurisdiction under the FTCA on the ground that Karim was not acting within the scope of his employment at the time of the accident; denied Karim's motion for declaratory judgment; declined to exercise supplemental jurisdiction over the state-law claims; and dismissed both actions without prejudice. *Fountain*, 2015 WL 5602934. On appeal, the Second Circuit vacated the dismissal, reinstated all claims, and remanded for an evidentiary hearing and further proceedings, primarily on the ground that summary judgment was premature because material questions of fact existed regarding whether Karim was acting within the scope of his employment. *Fountain*, 838 F.3d at 131. On remand, after a hearing and further proceedings, this Court dismisses the actions for lack of subject-matter jurisdiction and dismisses the state law claims without prejudice.

### ISSUES ON REMAND

"The United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). The FTCA, which grants a limited waiver of sovereign immunity, provides in pertinent part that United States district courts

> shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or

omission occurred.

28 U.S.C. § 1346(b)(1).  Because the FTCA creates a waiver of sovereign immunity, it is strictly construed in favor of the Government.  *See Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012).  The party asserting subject matter jurisdiction bears the burden of proof by a preponderance of the evidence.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Courts interpret the FTCA's "scope of employment" requirement in accordance with the law of the jurisdiction where the tort occurred.  *See Fountain*, 838 F.3d at 135.  Under New York law, an employer is liable for the negligence of an employee acting within the scope of his employment.  *Id*.; *Lundberg v. State*, 25 N.Y.2d 467, 470 (1969).  As the Second Circuit points out, under New York law, an employee acts within the scope of his employment when "(1) the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities, and (2) the employee is doing something in furtherance of the duties he owes to his employer."  *Id*. at 135 (internal quotation marks and brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 470 (1969))).  In vacating and remanding, the Second Circuit found questions of fact bearing on whether, at the time of the accident, Karim was acting within the scope of his employment such that this Court would have subject-matter jurisdiction under the FTCA's limited waiver of sovereign immunity.  In particular, the Second Circuit observed: "Whether Karim had implied permission to take the Government-owned vehicle on the night of the accident could influence the outcome of either or both prongs of the scope-of-employment test."  *Id.*  While it is undisputed that Karim did not have express permission – either written or verbal – to take the GOV, the Second Circuit found that the record did not establish as a matter of law whether or not Karim had

-13-

implied permission. The Second Circuit cited to evidence supporting a finding of implied permission as follows:

> (1) the evidence of [Karim's] past practice at the Rochester duty station of taking a Government-owned vehicle overnight and receiving retroactive approval from his supervisor there. Karim argues that he followed this practice on the night of the accident. And there is (2) the signature of Boozer, his Walton-office supervisor, on Karim's Optional Form 26, which could be interpreted as an endorsement of Karim's claim on that form that he had authorization to use the vehicle because he submitted a Form AD-728 prior to leaving the office.

*Id*. at 134. The Second Circuit next referred to evidence supporting a finding that Karim did not have implied permission:

> (1) the Government's written policy requiring prior written approval before taking a Government-owned vehicle overnight; (2) a statement by Hopkins, the Rochester-office supervisor, and statements from other USDA employees that, at a minimum, prior oral approval from a supervisor was required before a Government-owned vehicle could be taken overnight; and (3) Boozer's [Standard] Form-91, on which he wrote that Karim lacked authorization to take the Government-owned vehicle overnight and would not have been given permission if Karim had asked ahead of time.

*Id*. at 134-35.

The Second Circuit then addressed the two prongs of the *Lundberg* scope-of-employment test. With respect to the first prong – whether the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities – the Second Circuit observed that "as a general rule, an employee driving to and from work is not acting in the scope of his employment, because although such activity is work motivated, the element of control is lacking." *Id*. at 135 (quoting *Hamm*, 483 F.3d at 138). Here, although Karim's commute between Walton and the Oneonta Holiday Inn was not "on the clock or otherwise reimbursable," the Second Circuit stated that the element of control was "very much in dispute," because Karim was driving

-14-

a GOV, and "it appears that the Government imposes restrictions on employees who drive its vehicles," such as keeping them locked and not using them for personal convenience. *Id.* at 136. The Second Circuit added: "If Karim operated the vehicle with implied permission, he may have done so subject to those or similar restrictions, which could in turn demonstrate a measure of control by his employer." *Id.*

Regarding the second prong of the *Lundberg* scope-of-employment test – whether the employee is doing something in furtherance of the duties he owes to his employer – the Second Circuit wrote:

> [W]e can see several potential bases for a conclusion that, by taking the Government-owned vehicle overnight, Karim was acting in furtherance of his duties to the USDA. For instance, taking the vehicle may have allowed Karim to maximize his time at the Highland Falls office the following day. Or, Karim's route may have in fact been safer and posed less of a risk of an accident involving the vehicle. Thus, on the facts of this case, if Karim had implied permission to take the Government-owned vehicle on the date of the accident, this might in turn imply that his taking of the vehicle was to the USDA's benefit, and thus in furtherance of his duties to the USDA.

*Id.* at 138. The Second Circuit also instructed the Court to consider whether the Government could be liable for Karim's negligent driving under the FTCA and V&T Law § 388. *Id.* at 139.

## DISCUSSION

### Home-to-Work Travel; TDY

DeMaio Grace, Hopkins, and Odekirk explained that there were only two ways an employee in Karim's position could take a GOV for home-to-work travel, *viz.*, by obtaining either a Traveler Authorization permitting such use or a supervisor's authorization on a Form AD-728.[2]

---

[2] Hopkins explained that for certain TDYs, an employee could receive special prior authorization to use a GOV throughout the detail. In such a case, the Form AD-728 was not required because the

(continued...)

-15-

Karim cites no other law or regulation providing for any other type of authorization, nor is the Court aware of any. As already noted, Karim's Traveler Authorization did not expressly authorize use of a GOV for home-to-work travel. Thus, he needed a supervisor's authorization on a Form AD-728 every time he took a GOV for such travel. The statute, regulations, documents, and testimony of DeMaio Grace, Odekirk, Boozer, and Hopkins establish that supervisory authorization may be granted if an employee has a legitimate business reason to take a GOV home overnight for field work in the morning, provided that it is a benefit to the Government. Ordinarily, to take a GOV for home-to-work travel, the employee must obtain prior written approval on a Form AD-728, although where justified the employee may obtain prior verbal approval followed by after-the-fact written approval on a Form AD-728. It is undisputed that when Karim took the GOV on August 24 and 31, he did not have prior written or verbal approval.[3]

The testimony of Odekirk and Hopkins established that, a year or two before Karim was assigned the Walton TDY, Odekirk trained employees, including Karim, in USDA policy regarding the use of a GOV. Based on this evidence and Karim's testimony and conduct – including his repeated submissions of AD-728 forms to Hopkins and Boozer – the Court finds that Karim knew he was required to obtain prior approval to take a GOV for home-to-work travel, both while at his permanent duty station and while on TDY.

At this hearing, Karim contended that during the Walton TDY he was entitled to use a

---

[2](...continued)
employee already had authorization. Neither Karim's Traveler Authorization nor any other document gave Karim such authorization.

[3] The Court considers the August 24, 2010 incident insofar as it may be relevant to the question of implied permission.

-16-

GOV at all times and thus did not need express or implied permission to take the GOV on August 24 and August 31, 2010. This view of the law is mistaken. Section 1344(a)(1) of Title 31 of the United States Code provides:

> Funds available to a Federal agency ... may be expended by the Federal agency for the maintenance, operation, or repair of any passenger carrier only to the extent that such carrier is used to provide transportation for official purposes. Notwithstanding any other provision of law, <u>transporting any individual ... between such individual's residence and such individual's place of employment is not transportation for an official purpose.</u>

(Emphasis added.)

The Federal Travel Regulations for employees on TDY are set forth in 41 C.F.R. Subtitle F, Chapter 301, "Temporary Duty (TDY) Travel Allowances." Section 301-10.220 provided at the relevant time:

> What requirements must I meet to operate a Government automobile for official travel?
>
> You must possess a valid State, District of Columbia, or territorial motor vehicle operator's license and <u>have a travel authorization specifically authorizing the use of a Government-furnished automobile</u>.

(Emphasis added.) Karim did not have a travel authorization "specifically authorizing" him to use a GOV for home-to-work travel on August 31 or any other time during his Walton TDY. The Traveler Authorization for his Walton TDY authorized reimbursement only for travel in his POV from Rochester to Walton at the beginning of the TDY on August 1, 2010, and from Walton back to Rochester at the end of the TDY on November 20, 2010. Nothing in Chapter 301 supports Karim's argument.[4]

---

[4] 41 C.F.R. § 301-10.201 does not support Karim's position. It provides that an employee may use a GOV "only for official purposes" and gives examples of official purposes. The section cannot

(continued...)

-17-

In support of his argument that, while on TDY at Walton, he was entitled to use the GOV at all times without express or implied permission, Karim points to USDA Departmental Regulation ("USDA reg.") 5400-005, which sets forth requirements for employees' use of vehicles for home-to-work transportation. Subdivision (4)(a) of USDA reg. 5400-005 states: "[T]his regulation [does not] affect the provisions set forth in the Federal Travel Regulations for employees on temporary duty (TDY) away from their designated or regular place of employment." Karim reads this as excusing him from any requirement for prior approval before taking a GOV. The record clearly establishes, however, that regardless of whether USDA reg. 5400-005 applied, Karim was required by statute and regulation to obtain verbal or written authorization prior to taking a GOV for home-to-work travel while at the Walton TDY. The record also clearly establishes that at the times in question Karim knew he was required to do so.[5]

In a related argument, Karim contends that he was entitled to unlimited use of the GOV while on Walton TDY because he was on "travel status." [6] Based on the statute and regulations

---

[4](...continued)
reasonably be read to remove the requirement that an employee have authorization to use a GOV.

[5] Indeed, Karim acknowledged at his deposition that USDA policy required prior approval, although he said the practice at the Rochester duty station did not.

[6] Karim bases this view on his own research conducted years after the accident, not on any first-hand experiences during his employment at Rochester or Walton. In fact, he repeatedly admitted in the instant hearing and in his interview with Odekirk that, before the accident, he believed he needed Form AD-728 authorization to take a GOV home-to-work, and that he had always acted in accordance with this belief.

In this respect, the Court rejects the testimony on the subject from P. Dwight Holman, who had been Deputy Chief for Management and Administration at NRCS until his retirement in 2006, to the extent it may support Karim's present position that he did not need a Form AD-728 because he was on "travel status." Holman had no first-hand knowledge of the facts in this case, offered no useful information tending to show a pattern or practice at NRCS or specifically in the Rochester office, and had
(continued...)

-18-

discussed above and the knowledgeable and credible testimony of Hopkins, Odekirk, and DeMaio Grace, the Court rejects this argument.[7] As already noted, Karim's Traveler Authorization did not authorize any use of a GOV. Nothing in the law, regulations, or record supports an inference that his TDY status in itself gave rise to actual or implied permission to take the GOV for home-to-work travel on August 31, 2010, or at any other time. Importantly, Karim's *post hoc* mistaken reading of the law has no bearing on the question of implied permission or any other relevant issue, because it is undisputed that when he took the GOV on August 24 and August 31 he believed (correctly) that he needed authorization to do so.

**Implied Permission**

### *General USDA/NRCS Practice*

Based on the record and the Court's assessment of the witnesses' credibility, the Court finds that the general USDA/NRCS practice, the practice at Karim's permanent duty station in Rochester, and the practice at his TDY at Walton all required prior verbal or written approval before taking a GOV for home-to-work travel. The conclusion that general USDA/NRCS practice – in accordance with the statute and regulations – required prior verbal or written approval, is supported by the testimony of DeMaio Grace, Odekirk, Hopkins, Boozer, and

---

[6](...continued)
not been qualified as an expert. Indeed, on cross examination he acknowledged that Karim's situation was governed by 41 C.F.R. § 301-10.220, not USDA reg. 5400.

[7] Odekirk explained:
> Travel status in general has to do with where you're going, the per diem and [incidental expenses] ... associated with that particular geographic location, whether you're going to fly, use a train, or if you're going to drive a car ... using a Government vehicle ... or are you taking a POV, that would be in the authorization. That's all part of the travel authorization.

(Emphasis added.) Thus, while in some cases a Traveler Authorization may authorize an employee on TDY to use a GOV at all times, Karim's did not.

Richard Swenson.  Swenson, who had held a NRCS position similar to Boozer's from 1994 to

2002, testified that when he was a NRCS employee, he was always required to get a supervisor's

permission before taking a GOV for home-to-work travel, both when on TDY and when at his

permanent duty station.[8]  He added that, if he had time to get his supervisor's signature on a Form

AD-728 before leaving with the GOV, he would do so, and if not, he would send a voice mail to

his supervisor and receive back a voice mail with verbal approval before he took the GOV.  In his

supervisory role, Swenson handled supervisees' requests in the same manner.

*Practice at Rochester*

The Second Circuit identified a factual question regarding whether Karim's "past practice

at the Rochester duty station of taking a Government-owned vehicle overnight and receiving

retroactive approval from his supervisor there" was such that Karim had implied permission to

take the GOV to Oneonta on the date of the accident.  *Fountain*, 838 F.3d at 134.  At one point in

his testimony Karim stated that, before his Walton TDY, the procedure in Rochester required

prior written or verbal approval from his supervisor before taking a GOV home overnight.  At

another point, he stated that Hopkins allowed employees to take a GOV for home-to-work travel

without prior verbal or written authorization and routinely gave retroactive authorization by

signing their AD-728 forms after the fact regardless of whether he had given prior authorization.

The Court rejects this allegation.  As explained below, the Court finds that the practice in the

Finger Lakes Watershed area under Hopkins' supervision required employees to obtain verbal or

_____

[8] Karim also relies on the Swenson's testimony to the effect that the regulations authorize an
employee on TDY to use a GOV at all times and that Karim should not have been required to submit a
Form AD-728 or obtain permission from Boozer to use the GOV for home-to-work travel while at
Walton.  On cross examination, it appeared that Swenson's testimony was not based on any practice in
Rochester, Walton, or anywhere else, but on his own interpretation of the Federal Travel Regulations,
which the Court does not adopt.

written approval prior to taking a GOV for home-to-work travel. The Court bases this finding on an evaluation of the credibility of Karim's and Hopkins' testimony, as well as other record evidence.

Hopkins testified he had occasionally signed Karim's Form AD-728 after Karim had left with the GOV, but only when he had already given Karim prior verbal approval.[9] Hopkins stated:

> Q  [H]as Anwar Karim ever taken a Government car while under your supervision without either verbal or written approval before hand?
> A  Not to my knowledge.[10]

On several occasions Karim submitted a Form AD-728 form so late in the day that Hopkins was not available to sign it. The motion record (Dkt. No. 79) includes seven AD-728 forms submitted by Karim and signed by Hopkins between June 2009 and May 2010. Six of the seven propose home-to-work travel beginning on the date Karim signed them; the seventh proposes travel the following day. Five of the seven were faxed and are date- and time-stamped as of the date Karim signed them: 06/09/2009 18:31(or possibly 15:31), approved by Hopkins 6/10/2009; 07/14/2009 16:26, approved by Hopkins 7/15/2009; 01/20/2010 17:44, approved by Hopkins 1/21/2010; 02/23/2010 15:51, approved by Hopkins 2/23/2010; and 05/12/2010 15:45, approved by Hopkins

---

[9] The Second Circuit noted:
> Three other USDA employees in positions similar to Karim's who were also supervised by Hopkins stated during internal USDA interviews that they knew they were supposed to obtain written authorization before using a Government-owned vehicle, and that in no case could they or did they actually use a Government-owned vehicle without first obtaining at least oral authorization.
*Fountain*, 838 F.3d at 132. These employees did not testify at the hearing.

[10] Hopkins' office was in Marcy, New York, whereas Karim worked at the Finger Lakes field office in Rochester, New York. Hopkins acknowledged it was theoretically possible for Karim to have taken a GOV without ever informing Hopkins that he had done so, but there is nothing to suggest this ever happened.

5/13/2010.[11]  These time stamps are consistent with Hopkins' testimony that Karim typically

submitted the forms near or after the end of the workday on the day he took the GOV for home-

to-work travel.  Hopkins did not recall any other employees who submitted AD-728 forms late in

the afternoon on the day they took the GOV.  Hopkins discussed these late submissions with

Karim and counseled him twice about the issue.  Hopkins testified:

> Q  In those instances where Mr. Karim submitted the form to you late, did
> you give verbal approval prior to his placing the vehicle in use?
> A  Yes, or else I would not have signed the form. I do not sign forms unless
> the approval was given.
> Q  The confirmation that approval was sought is the fact that you signed it?
> A  Right.

With respect to the general practice, Hopkins testified:

> Q  But if you didn't give verbal approval ahead of time and you subsequently
> found out by looking at the AD 728 ... and you didn't approve it, would you
> mark it as approved, even though the vehicle had been  returned?
> A  I would mark it disapproved.  They did not have authorization. ...
> Q  And why would you do that?
> A  To document the fact that they did not have authorization and I would
> counsel the employee about the proper procedure and not to put themselves
> in that position again.

When asked: "If an employee sends in an AD 728 and it is not acted upon, is it okay for the

employee to take the car?"  Hopkins responded: "No .... Again, without previous verbal or email

or IM or phone conversation, if they're just sending [the Form AD-728 ] in and it's not approved

in some form or fashion, then they should not be taking that car."  He has punished employees for

taking a GOV for home-to-work travel without prior authorization.  Hopkins testified that during

his tenure at NRCS – almost 37 years in eight locations – the same procedure always applied.

---

[11] Hopkins signed the other two AD-728 forms two days after the date on Karim's signature, but they bear no date and time stamp, and the Court cannot determine how or when Karim provided them to Hopkins.

Questioned regarding the purposes for which he approved Karim's requests to use a GOV for home-to-work travel, Hopkins responded: "Typically, he would be going to a meeting and he would request the use of the Government vehicle stored at his home, getting access to, typically, the New York State Thruway because he lived right close by...."  In deciding whether to grant a request for home-to-work travel, Hopkins generally considered time and distance.  He stated:

> Q    ... [If an employee] submitted to you an AD 728, they said they were going from point A to point B, did you ever get involved in telling them the best route, the fastest route or shortest route or any of those issues, in connection with how they intended to traverse that route?
> A  I would typically not tell somebody how to go.  However, if someone was proposing to do something that did not make sense to me; in other words, it was not a direct route, I would probably deny that request.

Hopkins has occasionally denied employees' requests to take a GOV for home-to-work travel.  He explained:

> A  Employees have asked in the past to store a Government vehicle home-to-work at a location and when they proposed what they were going to do, it did not make sense to me because it was not a benefit, first of all, it was not a benefit to the Government.  And, typically, that had to do with their travel route; in other words, they were going out of their way to store the vehicle at home and that was not directly enroute to the location that they were headed the next day.
> Q   Is it important for an employee to send in these forms in advance, does that have any relation to what you just discussed with, for example, the route and making sure it's in the Government's efficiency?
> A   Sure.

Hopkins did not typically consider road construction conditions but would do so if they were brought to his attention.  Based on his demeanor, his testimony, and other evidence in the record, the Court finds Hopkins' testimony credible.

Also relevant to the practice in Rochester is the testimony from Odekirk that during the course of her investigation of the August 31 accident, she interviewed other USDA employees

who worked for Hopkins.  She explained that it was important to determine whether – as Karim claimed – Hopkins allowed employees to take GOVs for home-to-work travel without authorization.  She found no evidence supporting Karim's claim that Hopkins did so.  She stated:

> I did learn that there were certain circumstances in which employees were given verbal approval, yes. I did not find any circumstances of anyone saying that they ever took a Government vehicle without at least receiving verbal approval from Mr. Hopkins.
> ***
> I did not find anything, anything, any situation in which an employee had taken [a GOV] without actually receiving, at least, verbal approval first.

At the deposition and hearing, Karim testified with respect to the practice at his permanent duty station in Rochester.  He stated at the hearing: "I would prepare the AD 728 and fax that at the end of the day to Mr. Hopkins."  He would then take the GOV home after work on the same day, use it for official business the next day, and return it to the duty station the following day.  At some point after taking the GOV he would receive the signed Form AD-728 from Hopkins.  Karim stated that he sometimes obtained verbal approval from Hopkins before taking the GOV, but that sometimes he did not; that Hopkins always signed the Form AD-728 after the fact regardless of whether he had given Karim prior verbal authorization; that Hopkins never reprimanded him or otherwise indicated that the procedure was improper; and that "that is how we've operated in the Finger Lakes."  When pressed for details, however, Karim appeared to be less certain.  For example, at his deposition, Karim testified that "on approximately five occasions" in the Rochester office under Hopkins he was "allowed to submit AD-728s and take the Government car home overnight without receiving prior approval."  He did not know the dates when he was allowed to do this, nor could he give any details regarding the five prior occasions, and, when asked specifically about Hopkins' statement that he always required prior

-24-

verbal or written approval, Karim stated only: "Maybe a couple instances probably didn't have prior verbal approval." He acknowledged that, during his interview with Odekirk, she asked if he could give her the names of other employees supervised by Hopkins who had taken a GOV home for overnight storage and he responded he "didn't know how prevalent this is in the Finger Lakes team." At the hearing he denied having been trained by Odekirk regarding the use of a GOV; however, the Court accepts the testimony of Odekirk and Hopkins that Karim did receive such training a year or two before his assignment to the Walton TDY.

Karim also introduced the testimony of Willie Pittman, who worked for NRCS for 38 years, retiring in 2009. Pittman worked under Hopkins' supervision in a position similar to Karim's for a period ending in 1999. On direct examination, Pittman stated he was never required to submit a Form AD-728 to Hopkins and was never reprimanded by NRCS for failing to do so. On cross examination by the Government, however, Pittman admitted he had never taken a GOV for home-to-work travel.[12]

### *Practice at Walton*

With respect to the practice at Karim's Walton TDY, it is undisputed that Boozer did not give Karim prior verbal or written approval to take the GOV for home-to-work travel on August 31. Further, the evidence does not support a finding that Karim had implied permission to take a GOV routinely for home-to-work travel while on TDY at Walton. He never claimed

---

[12] On cross examination, in support of Karim, Pittman also testified:

> Q Are you aware that the travel authorization that Mr. Karim had only covered the use of his personal car driving down to the detail in Walton and then driving back home to Rochester?
> A Well, that may have been the case and that probably is the case. But that ... travel authorization should have been more specific and should have been more inclusive to provide him transportation to acknowledge that he must have transportation ... at his temporary duty.

reimbursement for his drive between the Oneonta hotel and the Walton office because, as he stated: "It wasn't included in the travel authorization for travel."[13]

Karim admitted that when he arrived in Walton to begin the TDY, neither Boozer nor anyone else told him he could take a GOV for home-to-work travel without approval. He testified in his deposition that at Walton he was required to get approval in some fashion before he left with a GOV for home-to-work travel. In contrast, his primary argument at the hearing was that in Walton he did not need approval to take the GOV for home-to-work travel, because he was entitled to use a GOV at all times due to his TDY status, or "travel status." The Court has already rejected this interpretation of the law. Moreover, Karim first arrived at this view of the law in 2013; thus, it is not relevant to whether he had implied permission in 2010.

According to Boozer, USDA procedure regarding taking a GOV overnight required an employee to submit a Form AD-728 to his supervisor and obtain written approval prior to taking the vehicle, although under certain circumstances prior verbal approval was sufficient.[14] The same procedure applied throughout Boozer's USDA service of more than 30 years at many details including Texas, New Jersey, New York, Nebraska, and Iowa. He complied with the procedure as an employee and enforced it as a supervisor. When reviewing a request for home-to-work travel, he would consider whether the travel would be "an overall benefit to the federal

---

[13] As noted, Karim's Traveler Authorization for the Walton TDY only authorized reimbursement for the drive from Rochester to Walton on August 1, 2010 and the return from Walton to Rochester on November 20, 2010.

[14] Asked about circumstances warranting prior verbal approval, Boozer stated:
> Could be that the employee's supervisor is in travel or in a meeting and does not have access to official paperwork or a way to sign and send back and verbal approval can be provided. And in that case, ... once the supervisor gets back to the office and has a form, he or she can document verbal approval provided at certain date and authority was given then.

Government, some efficiencies gained, possibly some efficiencies with the work that you're going to conduct." Other factors might include weather or traffic issues. He did not ordinarily monitor the routes driven by employees, but generally an employee was expected to take the "most simple route."

When questioned about the letter of reprimand, Boozer stated:

> Q  What factors do you recall were considered by you in issuing the letter of reprimand?
> A  The determination that the vehicle was used without authority.
> Q  And how did you acquire that information that it was used without authority?
> A  There was an investigation of the process of the accident and there should have been an authority approval form filled out and given the authority to take the vehicle. There was no approval provided.

On the Standard Form 91, the "Motor Vehicle Accident Report" form, completed after the accident, Boozer wrote: "Request [to take the GOV for home-to-work travel on August 31] would have been denied as not advantageous to govt. Employee not performing within the scope of his official duties."

The Court does not credit Karim's testimony that, at some point after he took the GOV from the Walton office on August 24, he told Boozer that he had submitted a Form AD-728 on August 24 and commented that he had not received a response. Karim's testimony regarding the incident was vague. He said Boozer "didn't give [him] any concrete answers as to why he didn't sign that form." Karim did not recall when or where the conversation occurred, stating: "It may have been the following week at our leadership team meeting," which would likely have been on August 31. Karim does not allege that during the conversation he requested or received Boozer's verbal permission to take the GOV on August 31. He did not mention this alleged conversation during his interview by Odekirk or in the meeting with Boozer and DeMaio Grace when Boozer

gave him the reprimand letter. Boozer testified that Karim never told him he had taken the GOV on August 24.

Karim also alleged that he reached Boozer by telephone from the scene of the accident to inquire about insurance coverage. According to Karim, Boozer told him he had already received the emailed Form AD-728 but had not yet had a chance to review it. Karim also stated that Boozer did not tell him during that telephone conversation that his use of the GOV was unauthorized. Boozer denies that Karim telephoned him on August 31 and states that he learned of the accident from DeMaio Grace when he came to work the next morning, September 1, 2010.[15] It is not necessary to determine whether or not Karim called Boozer after the accident on August 31 as Karim alleges, because even accepting Karim's testimony, it would not support a finding of a practice of retroactive approval or implied permission.

Karim also relies on the actions of DeMaio Grace and Boozer in the days after they learned of the accident, pointing out that they did not report the GOV stolen or direct Karim to return the GOV to Walton immediately. On this record, such conduct does not support a finding that Karim had implied permission to take the GOV for home-to-work travel that weekend or that there was a practice of allowing retroactive approval.

### *Standard Form 91; Optional Form 26*

The Second Circuit cited Standard Form 91 as evidence supporting the Government's position, and Optional Form 26 as evidence supporting Karim's. Standard Form 91, "Motor

---

[15] DeMaio Grace said Boozer's administrative assistant told her of the accident when she first entered the office on the morning of September 1, 2010. There is no evidence of how or when the administrative assistant learned of the accident.

Vehicle Accident Report," was prepared and signed by Boozer. It is undated. In his own handwriting, Boozer wrote that the purpose of Karim's trip was "overnight storage of GOV for business trip in morning (9/1)." In the space designated "Authority for the Trip was Given to the Operator," Boozer wrote: "No Authorization." To the question, "Did this accident occur within the employee's scope of duty," Boozer checked the box for "No" and wrote: "Employee took GOV without signed authorization. Request would have been denied as not advantageous to govt. Employee not performing within the scope of his official duties." These statements are consistent with Boozer's testimony and lend support to a finding that there was no implied permission.

Optional Form 26, a post-accident form headed "Data Bearing upon Scope of Employment of Motor Vehicle Operator," was filled out by Karim on August 31, 2010, apparently at the accident scene. Karim checked boxes indicating that written authority for his use of the vehicle and for the trip had been given "In writing." In his own handwriting he added: "Submitted request AD-728 prior to leaving office via email" and "Submitted request to supervisor prior to leaving." Karim does not explain why he checked the boxes on the form indicating he had received written permission, when he knew he had not. At his deposition, Boozer testified that he erred in signing the form, and at the hearing he testified that "parts of it are inaccurate." Whatever the explanation for Boozer's signature, it is undisputed that he never gave written approval, either before or after the accident. On this record, neither Boozer's disavowed signature nor Karim's incorrect statements on the form support a finding of implied permission.

*Implied Permission - Conclusion*

Based on its review of the entire record, including its observations of the witnesses and evaluations of the witnesses' credibility, the Court finds that the practice in the Finger Lakes Watershed area, and specifically at Karim's Rochester field office under Hopkins' supervision, required employees to obtain verbal or written approval before taking a GOV for home-to-work travel. Hopkins' detailed testimony to this effect is credible and convincing; is consistent with the relevant documents, statute, and regulations; and is fully supported by the other credible testimony at the hearing, particularly that of Odekirk and DeMaio Grace. The Court finds that there was no practice of retroactive approval or implied permission at the Rochester office under Hopkins' supervision. The evidence further establishes that there was no practice of retroactive approval or implied permission at Karim's Walton TDY, nor was there any such practice generally at USDA/NRCS. The Court concludes that Karim did not have implied permission to take the GOV for home-to-work travel on August 31, 2010.

## SCOPE OF EMPLOYMENT

An employee acts within the scope of his employment when "(1) the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities, and (2) the employee is doing something in furtherance of the duties he owes to his employer." *Fountain*, 838 F.3d at 135 (citations, alterations, and quotation marks omitted). The Court now considers these two prongs in light of the record.

### *Control*

Regarding the first prong – whether the employer exerted control over the employee's use of the vehicle – the Second Circuit noted: "Under New York law, it is clear that, as a general rule, an employee driving to and from work is not acting in the scope of his employment, because

although such activity is work motivated, the element of control is lacking." *Id*. (citations and quotation marks omitted). It is undisputed that Karim's daily drive between Oneonta and Walton in his POV was not "on the clock" or otherwise reimbursable. Rather, it was done "purely on his own time in order to commute to his place of employment." *Hamm*, 483 F.3d at 138. The Second Circuit stated, however, that "[i]f Karim had implied permission to use the Government-owned vehicle for the purpose of facilitating his trip to the Highland office, then ... his trip from the Walton office to his hotel could be said to be work-related, and not solely a personal commute." *Fountain*, 838 F.3d at 137. As explained above, the Court finds that Karim did not have implied permission to use the GOV for home-to-work travel on August 31 for the purpose of facilitating his trip to the Highland office or any other purpose. The trip was solely a personal commute.

*Lundberg* recognized an exception to the general rule that an employee driving to and from work is not acting within the scope of his employment.

> An employee who uses his car in furtherance of his work is acting in the scope of his employment while driving home from his last business appointment, since such a person is working, and is under his employer's control, from the time he leaves the house in the morning until he returns at night.

*Id*. at 136-37 (quoting *Lundberg*, 25 N.Y.2d at 471; alteration omitted). It is, however, undisputed that Karim ordinarily used his POV to commute to and from work, did not use it in furtherance of his work, and was not driving it at the time of the accident. On this record, the fact that he was driving a GOV on August 31 does not support a finding of control, inasmuch as he did not have permission to take it; in fact, neither Boozer nor anyone else knew he was taking it until after he had done so.

The fact that Karim drove the GOV to Highland Falls on September 1, 2010 does not

support a finding that on August 31 he was "driving [the GOV] from one place of work (the Walton office) to another (the Highland office), with a stop in between (the Oneonta Holiday Inn)." *Id*. at 136. The hearing record clearly establishes that Karim did not merely "stop" between one place of work and another; rather, he took the GOV from his place of work without permission, leaving it overnight at his own residence on two nights and deviating so far from the route between the two work locations that he added 97 miles to what should have been a 172-mile day trip. He was not working at the time of the accident, but simply commuting to his residence at the end of the workday. There is no basis to find that Karim "[was] working, and [was] under his employer's control" during the trip from Walton to Oneonta on August 31. *Id*. The *Lundberg* exception does not apply.

In addition, the restrictions the Government placed on an employee's <u>authorized</u> use of a GOV do not support a finding that the Government had any control over Karim's <u>unauthorized</u> use of the GOV on August 31. On this record, the Government's common-sense restrictions on an employee's authorized use of a GOV, such as keeping it locked and guarding it against damage or theft, do not support a finding of control.[16] Nor is there any other basis to find the Government exercised any control – direct or indirect – over Karim's use of the GOV on that date. Although arguably Karim's drive to Oneonta on August 31 may have been "work motivated," he was not acting within the scope of his employment, because the element of control was lacking. *See id*. at 135; *Hamm*, 483 F.3d at 138; *Lundberg*, 25 N.Y.2d at 471.

*In Furtherance of Duties Owed*

---

[16] In fact, Karim's use of the GOV on August 31, rather than being "controlled" by the restrictions, violated the restriction set forth in the Form AD-728 that the employee "not use this vehicle at any time for [his] personal convenience."

-32-

In remanding, the Second Circuit wrote that, if this Court decided the "control" issue in Karim's favor, it "would then be required to address the second prong of the scope-of-employment test under New York law: whether Karim was acting 'in furtherance of' the duties he owed to the Government, as his employer, at the time of the accident." *Fountain*, 838 F.3d at 137. Among the relevant factors are

> the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979) (citation omitted).

Although the Court has already decided the control issue against Karim, it addresses the "in furtherance of duties owed" prong as well. Consideration of the relevant *Riviello* factors does not support a determination that Karim was acting in furtherance of the duties he owed to his employer when he took the GOV to Oneonta on August 31. He took it after the workday ended on August 31 and did not use it for official business that evening. Rather, he took it to his personal residence – not a work-related site – and kept it overnight. Karim testified that he believed he was authorized to take the GOV for home-to-work travel on August 31 as follows:

> Q  So did you believe the trip was authorized?
> A  I did.
> Q  What made you come to that conclusion?
> A  It was within my geographical area of which I supervised and I was carrying out the responsibilities that Boozer assigned to me. Mr. Boozer asked me to go to the Highland Falls area office at least once or twice a week and this was my plan to go to the area office ... the following day.

Karim also indicated he believed the August 24 trip was authorized because Boozer had asked him to be at a meeting in Bath on August 25. Based on the record – particularly Karim's training,

-33-

his conduct in emailing AD-728 forms to Hopkins and Boozer, and the witnesses' deposition and hearing testimony – the Court finds the allegations are not credible. These trips were intended to be day trips, and Karim knew he did not have "blanket" authorization to take a GOV overnight for such trips. He knew he was required to get authorization every time he wanted to take a GOV for home-to-work travel. As the Court has already discussed in detail, the statute, regulations, USDA/NRCS policy, and actual practice at the Rochester and Walton offices required prior verbal or written approval before Karim or any other employee could take a GOV for home-to-work travel. There is no evidence that employees commonly took GOVs without authorization; rather, any such conduct was a clear departure from normal performance. Finally, NRCS cannot reasonably have anticipated that a long-time employee such as Karim, who had been trained in USDA/NRCS practice and had followed it while working under Hopkins, would disregard the requirement of prior approval. The *Riviello* factors favor the Government.

The Second Circuit observed that "if Karim had implied permission to take the Government-owned vehicle on the date of the accident, this might in turn imply that his taking of the vehicle was to the USDA's benefit, and thus in furtherance of his duties to the USDA." *Fountain*, 838 F.3d at 138. As this Court has found, however, Karim did not have implied permission; moreover, there is no basis to find that his conduct on August 31 was to the USDA's benefit. The fact that Karim's route added 97 miles to the round trip from Walton to Highland Falls, adding unnecessary gasoline expense and mileage to the vehicle, militates strongly against any finding of benefit to the Government. The Court rejects Karim's contention that his home-to-work trip with the GOV benefitted the Government because it shortened his travel time on September 1. He argued that, because he did not have to make the 27-minute trip each way

between Oneonta and Walton on September 1, he was able to spend more time at Highland Falls. The trip between Oneonta and Walton was, however, his personal commute, and any time savings resulted only in personal benefit to Karim.[17]

Moreover, the record makes clear that it was for the supervisor to decide whether it was beneficial to the Government for an employee to take a home-to-work route like the one taken by Karim. In fact, as Boozer wrote on Standard Form 91, if he had received a timely Form AD-728 for the Highland Falls trip, he would have denied the request "as not advantageous to govt." Boozer explained the requirement for approval as follows: "It has to be an overall benefit to the federal Government, some efficiencies gained, possibly some efficiencies with the work that you're going to conduct. So, it has to be something that is reviewed and determined at that particular point." Similarly, Hopkins testified that he has denied permission to employees to take a GOV home overnight when the request "did not make sense" because it was not a benefit to the Government. Hopkins said that a decision to deny a request typically "had to do with [the employee's] travel route," and that the factors he usually considered were "time and distance." For example, he has denied requests where the employees would have been "going out of their way to store the vehicle at home and that was not directly en route to the location that they were headed the next day."[18]

---

[17] Karim did not contest Odekirk's finding that the one-way trip from Walton to Highland Falls would be one hour and 56 minutes, whereas the one-way trip from Oneonta directly to Highland Falls would be 20 minutes longer – two hours and 15 minutes. With a 27-minute drive from Oneonta to Walton, the Oneonta-Walton-Highland Falls route would be two hours and 23 minutes. Any time savings from making the trip directly from Oneonta to Highland Falls on September 1, 2010 would be insignificant.

[18] As noted, when asked under what circumstances he had given Karim authorization to use a GOV for home-to-work travel, Hopkins stated: "Typically, he would be going to a meeting and he would

(continued...)

-35-

Karim's other justifications for his conduct include the claim that the route to Highland Falls via Oneonta would benefit the Government because it was safer and posed less of a risk of an accident. Again, this would be a matter for the supervisor to consider in evaluating a request. Boozer stated he would consider weather concerns and traffic issues if the employee "could document those and forward the [AD-728] form to a supervisor." There is no record evidence that the presence of such factors would permit an employee to take a GOV for home-to-work travel without prior authorization. In any event, Karim's testimony that the trip from Walton to Highland Falls had "steep grades" and road construction and was "very windy" speaks only to his personal convenience, inasmuch as there is no evidence that the route was unsafe or so difficult that avoiding the route would in itself benefit the Government.[19]  Karim also claimed at the hearing – for the first time – that the Oneonta to Highland Falls route "was a way of [his] getting to know the terrain, the environmental conditions and natural resource concerns that plagued the farmland owners in that particular area and community" and helped him "understand the extent of whatever conservation practices and engineering that would be required to address some of these concerns[.]"  This, too, would be a matter for a supervisor to consider in reviewing a request.

Karim offered no justification for submitting the Form AD-728 at the last minute before taking the GOV. He testified that on Monday, August 30, 2010, he had decided to visit the Highland Falls office on Wednesday, September 1. He said there was "no specific reason" why

---

[18](...continued)
request the use of the Government vehicle stored at his home, getting access to, typically, the New York State Thruway because he lived right close by...."

[19] Odekirk testified that she had driven the Walton-to-Highland route many times, and that it was "[a]dmittedly windy, but drivable, certainly in August. ... The weather conditions that day, there wasn't any rain, there wasn't any snow, obviously there wasn't ice. Certainly didn't merit driving an additional 97 miles just to take the thruway."

he waited from Monday August 30 until the end of the workday on August 31 to submit the form. Further, there was no meeting at Highland Falls scheduled for September 1; Boozer had not directed him to go to Highland Falls on that particular day; the staff there were not expecting him; and he gave no reason why he could not have delayed the trip until he obtained authorization from Boozer. Karim has not introduced credible evidence supporting a finding that his taking of the GOV on August 31 was to the USDA's benefit or in furtherance of his duties to the USDA.

### *Scope of Employment - Conclusion*

To conclude on the issue of scope of employment, the Court has considered all relevant factors in light of the following: the deposition and hearing testimony; the Court's evaluation of the witnesses' credibility; the statutory, regulatory, and documentary evidence; and the underlying record. On this record the Court finds that Karim has not carried his burden of showing by a preponderance of the evidence that at the time of the accident he was acting within the scope of his employment so as to establish jurisdiction under the FTCA. As Boozer wrote on the Standard Form 91: "Employee not performing within the scope of his official duties." Specifically, the credible evidence does not support findings that Karim had implied permission to take the GOV on August 31, 2010 for home-to-work use; that the Government had any control over his activities when he did so; that his use of the GOV on that date benefitted the Government; or that he was acting in furtherance of the duties he owed to his employer.

### **V&T LAW § 388**

The Second Circuit also instructed this Court to consider whether the Government might be held liable for Karim's negligent driving under the FTCA and New York's V&T Law § 388. As noted above, the FTCA gives United States district courts exclusive jurisdiction of civil

actions such as the one at bar, in which Fountain asserts claims against the United States for money damages for personal injury caused by the negligence "of an employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Karim and Fountain argue that the Government is liable under the FTCA because the United States, if a private person, would be liable to Fountain under New York State V&T Law § 388(1). This law provides:

> Every owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle ... by any person using or operating the same with the permission, express or implied, of such owner.

(Emphasis added.) There is no merit to the argument. The Court has found that Karim was not operating the GOV "with the permission, express or implied, of [the] owner." Therefore, V&T Law § 388(1) provides no basis for the vehicle owner's liability to Fountain. It follows that this case does not present "circumstances where the United States, if a private person, would be liable to the claimant" as required for governmental liability under the FTCA. 28 U.S.C. § 1346(b)(1). In addition, there can be no liability under the FTCA because, as the Court has found, Karim was not "acting within the scope of his office or employment" as required for FTCA liability. *Id*. Karim and Fountain have not carried their burden of proving subject-matter jurisdiction on this theory.

## CONCLUSION

Accordingly, the Court denies Karim's motion for a declaratory judgment/certification in both actions; denies without prejudice Fountain's motion for partial summary judgment in both

actions; grants the Government's motion for summary judgment on the ground of lack of subject-matter jurisdiction; declines to exercise supplemental jurisdiction over Fountain's state-law claims against Karim and dismisses them without prejudice; dismisses Fountain's tort action for lack of subject-matter jurisdiction; and dismisses Karim's indemnification action for lack of subject-matter jurisdiction. Both actions are dismissed in their entirety without prejudice.

It is therefore

ORDERED in *Fountain v. United States of America, United States Department of Agriculture, and Karim* (*"Fountain v. United States"*), 8:13-CV-255, that Karim's cross-claim (Dkt. No. 52), seeking defense and indemnification by the United States, and his motion/petition (Dkt. No. 55) demanding certification under 28 U.S.C. § 2679(d)(3), are dismissed for lack of subject-matter jurisdiction; and it is further

ORDERED that Karim's motion (Dkt. No. 73) for declaratory judgment/certification in *Fountain v. United States*, 8:13-CV-255, and *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture* (*"Karim v. United States"*), 3:14-CV-964, is denied without prejudice; and it is further

ORDERED that the United States' motion (Dkt. No. 75) for summary judgment is granted without prejudice; and it is further

ORDERED that Fountain's cross-motion (Dkt. No. 79) for partial summary judgment on the issue of liability in *Fountain v. United States*, 8:13-CV-255, and *Karim v. United States*, 3:14-CV-964, is denied without prejudice to an action in New York State courts; and any relief Fountain seeks against the United States in either case is denied for lack of subject-matter jurisdiction; and it is further

ORDERED that the Court declines to exercise supplemental jurisdiction over Fountain's state-law claims and they are dismissed without prejudice to an action in New York State courts; and it is further

ORDERED that the actions *Fountain v. United States*, 8:13-CV-255, and *Karim v. United States*, 3:14-CV-964, are dismissed for lack of subject-matter jurisdiction; and it is further

ORDERED that the Clerk of the Court is directed to close both cases, *Fountain v. United States*, 8:13-CV-255, and *Karim v. United States*, 3:14-CV-964.

IT IS SO ORDERED.

July 19, 2018
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge